## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**CHRISTINA L. STISCHOK,**

     **Plaintiff,**

             **Case No. C2-06-1030**

     **vs.**            **Judge Edmund A. Sargus, Jr.**

             **Magistrate Judge Mark R. Abel**

**HARTFORD LIFE GROUP**
**INSURANCE CO.,**

     **Defendant.**

### OPINION AND ORDER

This case involves review of a decision by Hartford Life and Accident Insurance Company to deny a claim for benefits under an employee benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 28 U.S.C. § 1001 *et seq.* This matter is before the Court for consideration of the Cross Motions for Judgment on the Administrative Record filed by Plaintiff, Christina L. Stischok,[1] and Defendant, Hartford Life and Accident Insurance Company.[2] Plaintiff seeks a reversal of Defendant Hartford's decision denying her claim for accidental death benefits following the demise of her husband, William Bradley Stischok. Hartford contends that it properly denied benefits based upon its determination that Mr. Stischok's death was not an accident but was the result of an intentionally self-inflicted injury. For the reasons that follow, Plaintiff's Motion is **GRANTED;** and Defendant's Motion is **DENIED.**

---

[1]     Plaintiff styled her Motion as one to "enforce her rights under the terms of an ERISA plan." The Court construes her Motion as one for judgment on the administrative record.

[2]     Defendant Hartford Life and Accident Insurance Company is a successor by merger to Hartford Life Group Insurance Company. The Court hereinafter refers to this Defendant as "Hartford."

**I.**

Plaintiff, Christina L. Stischok, is an employee of Baker & Hostetler, LLP and a participant in her employer's Group Voluntary Accidental Death and Dismemberment Insurance Policy ("Policy" or "Plan"). Hartford both underwrites the insurance policy and administers Baker & Hostetler's ERISA plan. The Plan provided accidental death insurance for Plaintiff and her husband.

Plaintiff's husband, William Bradley Stischok, was a 30-year-old, college-educated sales representative for Hill Distributing Company. On December 31, 2005, he went to work and returned home at approximately 2:30 or 3:00 p.m. He watched a movie with his family, showered and helped his wife prepare their two children to spend the evening away from home.

Plaintiff and her family left the house and dropped off their two-year-old daughter at Mr. Stischok's parents' house. They then drove to a friend' s house where they remained for about one hour. Mr. Stischok drank one beer and ate a few snacks while visiting with this friend.

Plaintiff then drove herself, her husband and their seven-year-old son to a New Year's Eve party at the residence of Michael and Julie Mullins. The Stischoks arrived around either 8:45 or 9:30 p.m. Mr. Stischok brought beer to the party. He drank an undetermined amount of beer and shots of Crown Royal whiskey during the evening.

Around 2:00 a.m., Plaintiff and her son prepared to go to bed for the night. Mr. Stischok used an electric pump to inflate a mattress for Plaintiff and their son in the living room of the Mullins' residence. Once they were in bed, Mr. Stischok returned to the kitchen to play cards with three other individuals. The card games continued until approximately 4:00 or 4:30 a.m. Witnesses reported that Mr. Stischok's behavior was normal and not out of the ordinary while he was playing cards, and that he seemed to be having a good time.

-2-

When Mr. Stischok arose from the table, he appeared shaky on his feet and exhibited other signs of intoxication. Mr. Mullins and Mr. Mathew Fitzpatrick, who had been playing cards with him, assisted Mr. Stischok into the living room and helped him lie down on the floor, with his head partially on an inflated air mattress. Mr. Mullins placed a towel on the floor in case Mr. Stischok became sick.

When Plaintiff woke around 8:30 a.m., she found Mr. Stischok laying face down on the floor, not on any part of the air mattress. She touched his hand, which felt cold to her. She then rolled him over, discovering that his face was entirely purple.

Plaintiff began screaming. She ran to the bathroom and vomited. Mr. Mullins called the 911 operator for assistance. Emergency personnel reported to the residence. The Coroner arrived shortly thereafter and pronounced Mr. Stischok dead.

The Licking County Coroner conducted an autopsy of Mr. Stischok and reported that his death was an accident caused by "acute ethanol drug effects." The toxicology report showed a blood ethanol level of 0.34% gm. The Coroner found no other chemicals in Mr. Stischok's body except for a slight amount of caffeine. The time of death was between approximately 4:30 a.m. and 7:30 a.m.

## B.  The Terms of the Policy

The relevant Policy provisions are as follows:

> **Injury** means bodily injury caused by an Accident. The Injury must:
> 1)  occur while coverage is in force; and
> 2)  result, directly and independently of all other causes, in a loss covered by the Policy.
>
> **Accident** means a sudden, unexpected, unusual, specific and abrupt event. Such event must occur by chance at an identifiable time and place while coverage is in force. Any loss caused by, or resulting from, a sickness or disease is not an accident.

-3-

(AR 27-28.)

The Policy also contained the following relevant exclusions from coverage:

. No benefits will be paid for loss caused by or resulting from: ... ..... .

. . . .

- suicide, a suicide attempt, self-destruction or an attempt to self-destroy while sane or insane;
- intentionally self-inflicted Injury while sane or insane;

. . . .

- Injury sustained while the Covered Person is under the influence of drugs, unless taken as prescribed by a Doctor.

(AR 119-20.)  The Policy does not contain a general alcohol exclusion.[3]

A separate Seatbelt and Air Bag Benefit is included in the same Policy and does contain an express exclusion related to alcohol intoxication.  This benefit provides a payment if a Covered Person dies from injuries sustained in an automobile accident while wearing a properly fastened seatbelt and if the automobile is equipped with an air bag. The Seatbelt and Air Bag Benefit expressly excludes from coverage "any loss caused by or resulting from any Injury sustained while the Covered Person is: . . . Intoxicated.  Intoxication means that which is defined and determined by the laws of the jurisdiction where the loss or cause of the loss occurred . . . ."  (AR 029.)

**C.     Plaintiff's Claim for Benefits**

Plaintiff submitted a claim for benefits under her employer's ERISA Plan.  Under the Policy, if Mr. Stischok's death was the result of an accident, Plaintiff would be entitled to benefits in the principal sum of $150,000.  Additionally, the Policy provides for a survivorship benefit that correlates to $1500 per month for six months.  The Policy also provides education and daycare

---

[3]     Hartford's Claims Examiner, Linda Durrance, noted as much in her claims worksheet. (AR 117, "No alcohol Exclusion.")

benefits for Plaintiff's children in the amounts of $3000, each. Thus, Plaintiff submitted a written claim to Hartford for payment of benefits in the amount of $165,000.

Hartford's Senior Claims Examiner, Ms. Linda Durrance, reviewed Plaintiff's claim for benefits. Ms. Durrance completed an "ADD Claim Worksheet" upon which she summarized some of the key facts regarding the claim. Ms. Durrance made a hand-written notation regarding the Policy "Exclusions:"

> – Self-inflicted
> – Suicide
> – Sickness/disease
> – Heart, coronary, ciir
> – Drugs
> No alcohol Exclusion

(AR 117). Ms. Durrance then made an entry in her claims notes regarding Mr. Stischok's cause of death: "The Amended Death Certificate indicates he died from acute ethanol drug effects. Policy has a drug exclusion but no alcohol exclusion. Will refer Toxicology report to NCM for review." (AR 122.)

Kathleen M. Bell, RN, then conducted a toxicological review, and reported to Ms. Durrance that the State of Ohio's "DUI standard is 0.08%." As a result, Ms. Bell opined that Brad was "legally intoxicated." (AR 123.) The Court notes that Ohio law defines a 0.08% blood alcohol level or above as impairment sufficient to prohibit such person from operating a motor vehicle. See O.R.C. § 4911.19(A)(1)(d). The state has not defined a level of "intoxication" or "impairment" for persons not operating a motor vehicle.

Ms. Durrance wrote a letter denying Plaintiff's claim. (AR at 119-21.) According to her letter, she based the denial upon (1) the Sheriff Department's report describing the events leading

up to Mr. Stischok's death, (2) the Coroner's toxicology report showing a blood alcohol level of 340 mg/100 ml, and (3) the death certificate stating that the cause of death was " [A]cute ethanol drug effects." (AR 120.) Ms. Durrance noted that the legal level of intoxication for Ohio is 80 mg/100 ml and that Mr. Stischok "was well over the level of intoxication." (*Id.*) Relying on the Policy's definitions of "injury,"'"accident," and the exclusion for "intentionally self-inflicted injuries," Ms. Durrance concluded that " [t]he Group Accidental Death benefit is not payable since your husband knowingly consumed ethanol all evening long to the level that he did at the party. His intoxication was intentionally self-inflicted and is excluded under this policy." (AR 120.)

Plaintiff appealed the denial of benefits. Plaintiff argued that there was no evidence that Mr. Stischok was suicidal or that he intended to injure himself. Second, she emphasized that although Mr. Stischok' s conduct may have been intentional, the consequences of his conduct certainly were not. Third, she maintained that Ms. Durrance had applied her own personal disapproval of excessive drinking rather than a rational interpretation of the Policy. Fourth, she argued that other insurance companies had paid accidental death benefits to the Plaintiff under policies with the same or similar exclusions. Based on these contentions, she concluded that Hartford's denial and reading of the Policy was, at best, unreasonable. (AR 52-55.)

Hartford again denied Plaintiff's claim on September 29, 2006. (AR 48-49.) Appeals Specialist Nancy Deskins identified two issues for resolution on appeal: "The first issue is whether or not Mr. Stischok's death was an accident and second whether the death falls within the exclusionary clause" for intentionally self-inflicted injuries. (AR 49.) Ms. Deskins concluded:

> While we acknowledge the extensive information shared with us in the filing of Mr.
> Stischok' s claim, and have thoroughly and independently reviewed the transcripts,
> toxicology reporting, the interviews, and the information sent on appeal, Appeals

must conclude that Mr. Stischok's cause of death was due to his excessive drinking, which was intentional and not accidental. Although he may not have intended to die as a result of his actions, the events that lead up to his demise are not proven consequences of an accident and were not caused by bodily injury, resulting directly and independently of all other causes in loss covered by this policy. The AD&D policy does not support loss or contain provisions for exception based on negligence such as the events that occurred prior to Mr. Stischok's untimely demise. We realize that you agree that his death was unexpected, unusual, abrupt and the result of a specific event that you are relating to a misfortunate chance that you concluded to mean a "risk" and "unexpected ,random, or unpredictable event." This is not the issue in the denial of the claim, it is the fact that his death was not accidental but was intentional due to the consequences of his action of excessive drinking. It is therefore the appellate determination that the denial ... was proper even though Mr. Stischok may not have intended to die as a result of his actions.

(AR 49.) This lawsuit followed.

## II.

Plaintiff alleges a wrongful denial of disability benefits and seeks recovery of benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B). Under this section of ERISA, a civil action may be brought by a participant or beneficiary "to recover benefits due to him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

A district court generally reviews a challenge under 29 U.S.C. § 1132(a)(1)(B) for a denial of benefits using a *de novo* standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir.1996). The deferential arbitrary and capricious standard of review applies, however, if the benefit plan grants "the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115. This directive does not mean, however, that the plan must employ the term "discretionary" or some other specific terminology. Although the plan

-7-

need not include "magic words" in order to vest the plan administrator with discretion, the grant of discretionary authority must be "clear" in order to trigger the arbitrary and capricious standard of review. *Hoover v. Provident Life & Acc. Ins. Co.,* 290 F.3d 801, 807 (6th Cir. 2002); *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (en banc).

The Plan provides that "[t]he plan administrator and other plan fiduciaries have discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy." (AR at 39.) Further, the Plan provides that "[t]he plan administrator has delegated sole discretionary authority to Hartford Life Group Insurance Company to determine Your eligibility for benefits and to interpret the terms and provisions of the plan . . . ." *(Id.)*

Plaintiff acknowledges that where an ERISA plan gives the plan administrator discretionary authority to determine benefits or construe the terms of the plan, the administrator's interpretation of the plan language is reviewed under an "arbitrary and capricious" standard. Under such a standard, the Court will uphold an administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 665 (6th Cir. 2006) *cert. granted*, 75 U.S.L.W. 3368 (No. 06-923) (U.S. Jan. 18, 2008). The parties indeed do not dispute that the arbitrary and capricious standard of review applies.

Plaintiff mentions, however, that Hartford has an "evident self interest" in denying benefits to Plaintiff because it will suffer a financial loss if it grants her claim, and contends that the Court must acknowledge Hartford's alleged conflict of interest when applying the arbitrary and capricious standard. Hartford contends that this argument fails as a matter of law because Plaintiff has failed to present "significant evidence" that its denial of benefits was motivated by a desire to save costs. Hartford maintains that, where the sole basis of Plaintiff's assertion of a conflict of interest is the

institutional one of its dual capacity as administrator and insurer, it is properly rejected.

The Court of Appeals for the Sixth Circuit has noted that, "[a]s administrator, [defendant, Summa Medical Plan] interprets the plan, deciding what expenses are covered, and as issuer of the policy, it ultimately pays those expenses. The District Court correctly recognized that the conflict of interest inherent in self-funded plans does not alter the standard of review, but 'should be taken into account as a factor in determining whether the . . . decision was arbitrary and capricious.'" *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir. 1998)(quoting *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 694 (6th Cir.1989)). A district court is "entitled to take into account the existence of a conflict of interest that results when . . . the plan administrator who decides whether an employee is eligible for benefits is also obligated to pay those benefits." *Glenn* 461 F.3d at 666.[4] The Court of Appeals has also concluded, however, that the inherent conflict of interest in a plan administrator's dual role as the administrator of the ERISA plan and the issuer of the insurance policy under the plan, standing alone, is not significant evidence that the conflict of interest influenced the administrator's decision. *Osborne v. Hartford Life & Accident Life Ins. Co.*, 465 F.3d 296, 300 (6th Cir. 2006).

---

[4]     In *Glenn*, the Sixth Circuit faulted the district court for not taking appropriate consideration of this conflict of interest in granting judgment to the plan. 461 F.3d at 666. On January 18, 2008, the Supreme Court granted *certiorari* in *Glenn* to consider the following questions: "(1) Did Sixth Circuit err in holding, in conflict with two other circuits, [the] fact that claim administrator of Employee Retirement Income Security Act plan also funds plan benefits, without more, constitutes "conflict of interest" that must be weighed in judicial review of administrator's benefit determination under *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101 (1989)? (2) If administrator that both determines and pays claims under ERISA plan is deemed to be operating under conflict of interest, how should that conflict be taken into account on judicial review of discretionary benefit determination?" *MetLife v. Glenn*, 128 S.Ct. 1117, No. 06-923 (Jan. 18, 2008).

Here, Plaintiff has not submitted significant evidence that Hartford's decision to deny her claim was motivated by a conflict of interest. She did not, in fact, seek discovery regarding the bias she alleges. *See Calvert v. Finance, Inc.*, 409 F.3d 286, 292 (6th Cir. 2005)(noting that, although generally disallowed in ERISA cases, limited discovery may aid a court in determining how much weight to give presumed conflicts of interest.) She asks only that the Court "temper" its application of the deferential arbitrary and capricious standard by recognizing that Hartford makes the benefit determinations and incurs the financial benefit or loss resulting from these determinations.

Under *Peruzzi, Glenn* and *Osborne*, the Court, therefore, applies an unaltered arbitrary and capricious standard of review, taking into account the institutional and inherent conflict of interest presented by Hartford's dual capacity as plan administrator and insurer.

The arbitrary and capricious standard "is the least demanding form of judicial review. . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Perry v. United Food & Commercial Workers Dist. Union*, 64 F.3d 238, 242 (6th Cir. 1995.) Determinations are not arbitrary and capricious if they are "rational in light of the plan's provisions." *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991).

Although the arbitrary and capricious standard is deferential, "'it is not, however, without some teeth.'" *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)(quoting *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107-08 (7th Cir. 1998)). The deferential arbitrary and capricious standard "does not mean [the court's] review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber-stamping

-10-

those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). Thus, the

Court's obligation under ERISA to review the administrative record to determine whether the plan

administrator acted arbitrarily and capriciously "inherently includes some review of the quality and

quantity of the medical evidence and the opinions on both sides of the issues." *McDonald*, 347 F.3d

at 172.

## III.

**A.     Alcohol Exclusion**

Hartford's stated rationales for denial of accidental death benefits in this case are,

specifically: "[t]he Group Accidental Death benefit is not payable since your husband knowingly

consumed ethanol all evening long to the level that he did at the party. His intoxication was

intentionally self-inflicted and is excluded under this policy" (AR 120);  and

> Mr. Stischok' s cause of death was due to his excessive drinking, which was
> intentional and not accidental. Although he may not have intended to die as a result
> of his actions, the events that lead up to his demise are not proven consequences of
> an accident and were not caused by bodily injury, resulting directly and
> independently of all other causes in loss covered by this policy. The AD&D policy
> does not support loss or contain provisions for exception based on negligence such
> as the events that occurred prior to Mr. Stischok' s untimely demise. . . . [I]t is the
> fact that his death was not accidental but was intentional due to the consequences of
> his action of excessive drinking.

(AR 040.)

Plaintiff maintains that Hartford is attempting to apply an alcohol exclusion where none

exists. She references the that fact that Hartford, through its agent, Ms. Durrance, examined the file,

and based upon that examination inquired only whether Mr. Stischok was "legally intoxicated."

Once Ms. Durrance received the nurse-consultant's report indicating that he was intoxicated, Ms.

Durrance sought approval to reject Plaintiff's claim. Hartford denies that it imposed an alcohol

-11-

exclusion and maintains that Plaintiff's suggestion to the contrary is sheer speculation, unsupported by any evidence in the record.

Hartford's claim file indicates that the only information considered between the date of its notice to Plaintiff acknowledging receipt of her claim, and the date of its correspondence to Plaintiff initially denying her claim was confirmation by Ms. Bell, RN, that Mr. Stischok's blood alcohol level exceeded Ohio's DUI standard. From this evidence, Plaintiff infers that Hartford is, in effect, adding an exclusionary term to the Policy, excluding from coverage injuries sustained by legally intoxicated individuals. Hartford counters that Ms. Durrance's notation on her ADD Worksheet demonstrate that the Policy did not contain an alcohol exclusion and shows, if anything, that Hartford did not read one into it for purposes of Plaintiff's claim.

The parties agree that the Policy does not contain a general exclusion based upon injuries sustained as a result of intoxication by alcohol. Moreover, the parties concur that an administrator's discretion to interpret a plan "does not include the authority to add eligibility requirements." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). Indeed, to rewrite an ERISA plan with unexpressed eligibility requirements, under the pretense of interpreting the document terms, according to the Court of Appeals, is *per se* "arbitrary and capricious." *Id.* at 664.

The conclusion by Ms. Bell that the decedent was "legally intoxicated" is incorrect. The 0.08% blood-alcohol ratio is used to determine only when a person is legally unfit to drive. Ohio law has not otherwise determined a level of "legal intoxication" for someone not driving. More importantly, the record is completely silent as to whether a blood-alcohol level of 0.34% is usually toxic or how much alcohol had to be consumed to reach this level.

Hartford drafted the AD&D Policy. Certainly, had it intended to exclude coverage for alcohol-related injuries, Hartford could have done so by including specific language in the Policy.[5] Otherwise, the Policy contains no such exception.

There is utterly no evidence that the decedent intended to commit suicide. There is evidence that he drank heavily on New Year's Eve. This conduct may have been negligent; so too is speeding or failure to yield. The latter conduct resulting in death would result in payment under the Policy. In both circumstances, the actors engaged in conduct that arguably "caused" their demise. This reading, however, is not supported by the language of the Policy. The decedent in this case, and the hypothetical negligent driver, did not intentionally cause their own demise under the terms used in the Policy.

**B.     "Accident"**

Hartford concluded that Mr. Stischok's death was not an "accident," and thus denied benefits. Plaintiff contends that his death was an "accident" as defined by the unambiguous terms of the Plan. Again, under the terms of the Policy, "Accident" is defined as "a sudden, unexpected, unusual, specific and abrupt event . . . [which] must occur by chance at an identifiable time and place while coverage is in force." (AR 27-28.)

"In interpreting a plan, the administrator must adhere to the plain meaning of its language as it would be construed by an ordinary person." *Morgan v. SKF USA*, 385 F.3d 989, 992 (6th Cir. 2004). ERISA plans must be interpreted "according to their plain meaning, in an ordinary and popular sense." *Perez*, 150 F.3d at 556. Plaintiff asserts that Mr. Stischok's death was "sudden,"

---

[5]     Indeed, the Seat Belt and Air Bag Benefit withing the Policy contains an intoxication exclusion.

-13-

"unexpected," "unusual," and "abrupt." She maintains that his death occurred by "chance," and offered a dictionary definition to Hartford of this term, which was undefined in the Policy, to which Hartford never raised an objection. (AR 54-55, 114-115.) The record confirms that Mr. Stischok's death was a specific event, which occurred at an identifiable time and place while coverage was in force. His death was not the result of sickness or disease.

"[T]he term "accident" has been heavily litigated throughout history." *Jones*, 385 F.3d at 662. Where no plain meaning can be discerned from the plan language, courts typically look to the federal common law to assess the reasonableness of a plan administrator's interpretation. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987); *Jones*, 385 F.3d at 661.

The First Circuit in *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077, 1085 (1st Cir. 1998), first "delve[d] into the metaphysical conundrum of what is an accident" under the common law for ERISA. The insured in *Wickman* died after he climbed over a guardrail on a highway overpass and fell onto the railroad tracks 90 feet below. *Id.* at 1080-81. Just before the fall, a witness observed Mr. Wickman standing outside the guardrail, holding on to it with one hand. *Id.* at 1080. The insured's accidental death policy defined the term"accident" vaguely, as "an unexpected, external, violent and sudden event." *Id.* at 1081.

The accidental means analysis, rejected in *Wickman*, focuses on whether the act proximately leading to injury is intentional, and then concludes that so is the result, even if the result itself was neither intended nor expected. *Id.* The Court found an "intentional means" analysis, which measures whether the means of death was voluntary, inappropriate. *Id.*

The *Wickman* court set forth the following approach for determining whether a death is accidental. If the fact-finder determines that the insured did not subjectively expect an injury similar

-14-

in type to the kind suffered following from his conduct, or if the fact-finder cannot ascertain the insured's subjective expectations, the court will conduct an objective analysis. *Id.* The objective analysis consists of a determination "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." *Id.* If the insured "actually expected the result, even if he did not specifically intend it," then his or her subsequent death is not accidental. *Id.* at 1089. The court found that an insured's expectations are relevant because "in most cases actual expectations govern the risks of an insurance policy." *Id.* at 1088. Applying its framework, the *Wickman* court concluded that the insured "knew or should have known that serious injury or death was a probable consequence substantially likely to occur as a result of his volitional act." *Id.* at 1089. The insured "either subjectively expected serious injury, or . . . [o]bjectively, he reasonably should have expected serious injury when he climbed over the guardrail and suspended himself high above the railroad tracks below." *Id.*

The record indicates that Hartford focused solely upon the means of injury by asserting that Mr. Stischok's intentional conduct meant that his injury was necessarily intentional as well. ("[Y]our husband knowingly consumed ethanol all evening long to the level he did at the party. His intoxication was intentionally self-inflicted and is excluded under the Policy." (AR 120); "[H]is death was not accidental but was intentional due to the consequences of his action of excessive drinking." (AR 49.) This approach ignores the holding in *Wickman* which rejected the application of the "accidental means" test.

In any event, the administrative record gives no indication of Mr. Stischok's subjective expectations and, accordingly, the objective inquiry guides this Court. Thus, the Court considers

-15-

whether a reasonable person, with the background an characteristics of Mr. Stischok, would have viewed the injury as highly likely to occur as a result of his intentional conduct.[6] On this score, the administrative record is devoid of any evidence upon which Hartford can justify the theory it offers, namely that a reasonable person views death or serious injury as the highly likely result of ingesting alcohol. A reasonable person with Mr. Stischok's background and characteristics may, no doubt, know that drinking excessive alcohol is highly likely to cause nausea, vomiting or passing out. A reasonable person with Mr. Stischok's background and characteristics may even have knowledge that death is a possible risk. Knowledge of a *potential* consequence, however, does not equate with knowledge of a *highly likely* result. Moreover, Hartford has provided no case law to suggest that a blood-alcohol level of .34% is fatal, and the administrative record does not contain any evidence that death is highly likely to occur from excessive drinking that leads to that level of blood-alcohol content.

None of the cases upon which Hartford relies involves the ingestion of alcohol alone. Instead, Hartford relies on cases involving drunken driving and illicit use of drugs. *Benson v. Assurity Life Ins. Co.*, 2004 WL 2106637 (W.D. Mich. June 16, 2004)(unreported)(mixture of methadone, amphetamine and methamphetamine intoxication); *McLain v. Metropolitan Life Ins. Co.*, 820 F.Supp. 169 (D.N.J. 1993)(cocaine-related cardiac arrest); *Weatherall v. Reliastar Life Ins. Co.*, 398 F. Supp.2d 918 (W.D. Wis.2005)(death caused by collision resulting from driving while intoxicated); *Sorrells v. Sun Life Assur. Co.*, 85 F. Supp. 2d 1221(S.D. Ala. 2000)(death caused by injuries sustained when operating motorcycle while intoxicated).

---

[6]     Hartford characterizes Mr. Stisckok's injury as "acute ethanol drug effects." This was the cause of death, according to the Coroner, not the injury itself.

-16-

Recently, the Sixth Circuit decided the case of *Lennon v. Metropolitan Life Insurance Co.*, 504 F.3d 617 (6th Cir. 2007). In *Lennon*, the Sixth Circuit Court of Appeals ruled that a beneficiary was not entitled to accidental-death benefits under an employee benefit plan because the insured was reckless to drive while intoxicated. Specifically, Lennon died after crashing his car into a wall while driving with a blood-alcohol level of 0.372%, more than three times the legal blood-alcohol limit in Michigan at the time of his death. Metropolitan Life Insurance Company ("MetLife") denied the beneficiary's claim because "the act of driving impaired rendered the infliction of serious injury or death reasonably foreseeable and hence, not accidental as contemplated by the . . . Plan." *Id.* at 620. MetLife also concluded that the mental and physical impairments caused by the voluntary consumption of alcohol constituted intentional self-inflicted injuries, which were excluded under the Plan. The beneficiary challenged the denial, but MetLife upheld its initial decision in a letter which again reiterated that (1) drunk driving rendered death reasonably foreseeable and therefore not accidental, and (2) voluntary consumption of excessive amounts of alcohol constituted intentional self-inflicted injury. MetLife also expressly cited a series of cases in its denial letters in which courts found that death while drunk driving was not accidental under ERISA.

The Sixth Circuit Court of Appeals found that MetLife did not act arbitrarily and capriciously. According to the Court, the insured's behavior was grossly negligent by driving with a blood alcohol level three times the legal limit, knowing that his impaired driving created a significant risk of bodily harm or death, and precautions to eliminate the risk would have imposed very slight burdens.

In this case, the risk covered by the decedent was qualitatively different, in that he never drove an automobile or even left his friends' home. Heavy drinking and driving greatly increases

-17-

the risk of death, to the point that an accident may be reasonably expected or even intended. The same conclusion does not arise from one who, in a friends' home with his family, drinks to excess on New Year's Eve.

Here, the Court is not called upon to determine whether driving while intoxicated creates a significant risk of death because Mr. Stischok did not drive, and his death was not the result of some external force, such as a car collision. He died from excessive drinking at a New Year's Eve party. *Lennon* only answers the question of whether driving while extremely intoxicated is an accident for purposes of ERISA.

"[F]ederal common law– from pre-*Erie* diversity cases to present day ERISA cases– focuses upon the expectations and intentions of the insured." *Jones*, 385 F.3d at 664. The Court concludes a reasonable person would expect that the Policy would provide coverage in the event of death from acute blood-alcohol effects. Accordingly, the Court finds that Hartford has arbitrarily and capriciously interpreted the term "accident."

## B. "Intentional Self-Inflicted Injury"

Hartford's alternative rationale, that Mr. Stischok died from a "self-inflicted injury,"also fails as an arbitrary and capricious interpretation of the Policy's express exclusion. The Policy exclusion provides that no benefits will be paid for "intentionally self-inflicted Injury . . . ." (AR 120.) In its letters to Plaintiff denying the claim, Hartford admitted that Mr. Stischok did not intend to die on New Year's Day. It asserts that his alcohol intoxication was itself the intentionally self-inflicted injury and that his death was not accidental, but was intentional, "due to the consequences of his action of excessive drinking." (AR 040.) The Court rejects this argument because it is based on an unreasonable interpretation of the Plan.

-18-

The Policy language dictates that an excluded injury be both self inflicted and intentional. Numerous courts have interpreted the term "intentionally self-inflicted injury." For example, the Seventh Circuit Court of Appeals upheld the Southern District of Illinois's interpretation of this term as meaning "the natural and probable consequence of an intentional act." *Morton v. Smith*, 91 F.3d 867, 872 (7th Cir. 1997). The Seventh Circuit has also held in a case concerning death due to drug overdose that "fatal mistakes" are not necessarily intentionally self-inflicted injuries. *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 465 (7th Cir. 1997). Instead, the insurance company must point to evidence in the record showing that the decedent intended to overdose or intended to inflict injury upon himself. *Id.* Without some evidence in the record that the decedent intended to kill himself or was even aware of the risk of serious injury or death, an administrator's determination that such a death was the result of an intentionally self-inflicted injury must be overturned. *Id.*

The Ninth Circuit Court of Appeals held the term "intentionally self-inflicted injury" is to be given its ordinary meaning and also concluded that evidence in the record must show that a decedent did something "other than make a fatal mistake." *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1129 (9th Cir. 2002) (citing *Santaella*, 123 F.3d at 465). In *Padfield*, death from autoerotic asphyxiation was deemed not an intentionally self-inflicted injury because there was no evidence that the decedent expected his actions to result in death. *Id.* at 1130. As the court pointed out, protection against "fatal mistakes" is the very purpose for which accident insurance is normally purchased. *Id.*

An *en banc* panel of the United States Court of Appeals for the Eighth Circuit addressed a similar issue in *King v. Hartford Life Ins. Co.*, 414 F.3d 994 (8th Cir. 2005).[7] In *King*, the insured

---

[7]     The Court recognizes that the outcome of the *en banc* Eighth Circuit decision in *King* is inconsistent with the Sixth Circuit's most recent pronouncement in *Lennon*. The Court here merely cites to *King* as persuasive authority for the propositions related to self-inflicted injuries, a subject that the

-19-

died in a motorcycle accident. At the time, he had a blood alcohol content ("BAC") of 0.19. *Id.* at

997. His accidental death insurance policy contained an exclusion for "intentionally self-inflicted

injury, suicide, or attempted suicide, whether sane or insane," much like the policy exclusion in the

instant case. The ERISA plan administrator relied on the intentionally self-inflicted injury exclusion

to deny benefits, claiming the insured's "alcohol intoxication was itself an 'intentionally self-inflicted

injury' that 'contributed to' his injuries and death." *Id.* Rejecting the plan administrator's

interpretation, the *King* court observed that "[o]ne rarely thinks of a drunk driver who arrives home

safely as an 'injured' party, and to define drinking to the point of intoxication as an 'intentionally

self-inflicted injury ...' is at least 'a startling construction.' " *Id.* (citation omitted). Moreover, in

light of other express exclusions in the policy, the *King* court held that the plan administrator's

interpretation would render meaningless exclusions for losses caused by "taking drugs . . . unless

prescribed . . .by a licensed physician." *Id.* at 1004-05.[8]

Hartford also cites to *Holsinger v. new England Mut. Life Ins. Co.*, 765 F. Supp. 1279 (E.D.

Mich. 1991), a case in which a drug addict died of cardiac arrest resulting from a codeine overdose.

The Court found that the ingestion of codeine is likely to cause injury, and that the decedent actually

knew that the drugs could injure him because he was both a long time drug abuser and a pharmacist.

*Id.* at 1282.

---

Sixth Circuit expressly declined to reach in *Lennon*. *See Lennon*, 504 F.3d at 624 ("Because it was not
arbitrary and capricious for MetLife to find that Lennon's death was not 'accidental' we need not reach
MetLife's argument that Lennon's death was a result of self-inflicted injury.")

[8]     Similarly, the interpretation is not reasonable in the context of this policy, because it
renders the next exclusion meaningless. Hartford's Policy provides that no benefit will be paid for
"Injury sustained while the Covered Person is under the influence of drugs, unless taken as prescribed by
a Doctor." If the exclusion for "intentionally self-inflicted injury" eliminated coverage for unintended
injuries caused by ingesting substances into the body, then there would be no reason for the illicit drug
exclusion.

-20-

Similarly,i n *Bevans v. Iron Workers' Tri-State Welfare Plan*, 971 F. Supp. 357 (C.D. Ill. 1997) the Court concluded the injury was "intentionally self-inflicted" following an incident in which a 17-year old consumed more than eighty 500 mg. tablets of Tylenol, and at least some amount of alcohol. The Court found that any reasonable person would have been aware of the risk, and that the teenage boy himself had to be aware of the risk as demonstrated by his own efforts to purge his body of the drugs by self-induced vomiting a few minutes after ingesting the tablets. *Id*. at 362.

Hartford also cited to *Ablow v. Canada Life Assurance Co.*, 2003 WL 23325805 (D. Conn. Nov. 19, 2003)(unreported), the court found that the decedent, a 43 year old man who died after drinking ¾ of a bottle of vodka and inhaling through his nose the powder of forty-five crushed ephedrine tablets was a long-time drug user who was aware of the dangers of his addiction as demonstrated by a stroke he had suffered six years earlier.

Hartford also relies upon *Shepherd v. Metropolitan Life Ins. Co.* 1995 WL 1682316 (S.D. Ohio March 10, 1995)(Rice, J.) In *Shepherd*, the insurer took the position that the ingestion of a combination of heroin, cocaine, oxycodone, and diazepam was itself the infliction of bodily injury. *Id.* at *5. Again, this case is distinguishable because it does not demonstrate that the mere consumption of alcohol is itself the infliction of bodily injury.

In this case, Hartford argues that drinking alcohol is itself a form of self-inflicted injury, and contends that the decedent behaved in a way that was sufficiently risky to evoke in the self-inflicted injury exclusion. Inherently risky activities, however, do not necessarily fall within the self-inflicted injury exclusions under ERISA plans. In order for risky behavior to be considered a self-inflicted injury, courts in this district require that the decedent must have known that the risky behavior was

-21-

likely to cause his or her injury. *See Harrell v. Metro. Life Ins. Co.*, 401 F. Supp. 2d 802, 811-12 (E.D. Mich.2005); *Holsinger*, 765 F. Supp. at 1279. Without any evidence in the administrative record to suggest that Mr. Stischok intended to inflict death upon himself by ingesting excessive alcohol, or would have known a blood-alcohol level of 0.34% could have likely killed him, Hartford's determination that the injury was self-inflicted was arbitrary and capricious.

## IV.

For the reasons set forth above, this Court finds that Hartford acted arbitrarily and capriciously in denying Plaintiff's request for benefits by determining that decedent's death was not accidental and fell under the Policy's intentional self-inflicted injury exclusion. Plaintiff's Motion to Enforce Her Rights Under the Terms of an ERISA Plan (Doc.#13) is **GRANTED**. Defendant's Motion for Judgment on the Administrative Record (Doc. #15) is **DENIED**.

**IT IS SO ORDERED.**

**3-31-2008**

**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

-22-